*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JOHN DOE,

        *Plaintiff-Appellant,*

      *v.*

No. 11-3019

THE SALVATION ARMY IN THE UNITED
STATES; THE SALVATION ARMY EASTERN
TERRITORY,

        *Defendants,*

THE SALVATION ARMY, a New York
Corporation,

        *Defendant-Appellee,*

CHUCK, (Last Name Unknown), nka Chuck
Snider,

        *Defendant.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:05-cv-901—Elizabeth A. Preston Deavers, Magistrate Judge.

Argued: April 20, 2012

Decided and Filed: July 11, 2012

Before: MOORE, GIBBONS, and ALARCÓN,[*] Circuit Judges.

_____

## COUNSEL

**ARGUED:** Kerstin Elisabet Sjoberg-Witt, OHIO LEGAL RIGHTS SERVICE, Columbus, Ohio, for Appellant. Hamilton DeSaussure, Jr., OLDHAM KRAMER, Akron, Ohio, for Appellee. **ON BRIEF:** Jane Pat Perry, OHIO LEGAL RIGHTS SERVICE, Columbus, Ohio, for Appellant. Hamilton DeSaussure, Jr., Cara L. Galeano-Legarri, OLDHAM KRAMER, Akron, Ohio, for Appellee.

_____

[*]The Honorable Arthur L. Alarcón, Senior Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

1

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   John Doe ("Doe") sued the Salvation Army for employment discrimination under § 504 of the Rehabilitation Act when one of its adult rehabilitation centers refused to hire him as a truck driver.  The only issue on this appeal is whether Doe has satisfied the fourth element of a prima facie case under § 504 of the Rehabilitation Act, which requires a plaintiff to establish that the program or activity accused of discrimination is receiving federal financial assistance. The statutory definition of "program or activity" permits consideration of the whole organization if the organization is principally engaged in the business of providing social services.  The district court granted summary judgment to the Salvation Army on the basis that it was a religious organization and therefore could not be principally engaged in the business of providing social services.  Doe appeals.  For the following reasons, we **REVERSE** the district court's judgment and **REMAND** the case for further proceedings.

**I.  BACKGROUND**

Doe[1] sued the Salvation Army[2] and one of its warehouse supervisors[3] in September 2005, claiming employment discrimination under the Rehabilitation Act. Doe alleged that the warehouse supervisor inappropriately asked him in an interview what kind of medications Doe was taking and refused to hire Doe as a truck driver when

---

[1] Doe was permitted to proceed pseudonymously in order to protect him from public disclosure of his medical condition.

[2] Doe initially sued "The Salvation Army in the United States" and "The Salvation Army Eastern Territory." R. 1 (Compl.).  Following receipt of the Salvation Army's responses to interrogatories, which clarified that the former did not exist and that the Eastern Territory was more properly labeled the "Salvation Army, a New York Corporation," *see* R. 18, Ex. A (Resps. to Interrogs. at 1-2), Doe amended his complaint to sue just the Salvation Army, a New York Corporation.  The Columbus Adult Rehabilitation Center is not a distinct legal entity; rather, it is a program operated by the Salvation Army, a New York Corporation, which employs the Center's employees. *Id.* at 2, 7.

[3] Chuck Snider was dismissed without prejudice by order of the court. R. 52 (Order).  He is not a party to this appeal.

Doe responded that he was taking "psychotropic" medications. R. 17 (1st Am. Compl. at ¶¶ 33-35). The Salvation Army moved for summary judgment on the basis that Doe failed as a matter of law to establish three of the four elements of a prima facie claim under the Act: Doe was not disabled within the meaning of the Act, the Salvation Army's decision not to hire Doe was justified on safety grounds, and the local program of the Salvation Army that declined to hire Doe, the Columbus Adult Rehabilitation Center ("Columbus ARC"), did not receive federal funds. The magistrate judge granted the motion on the first two grounds and declined to address the third. R. 26 (2007 D. Ct. Op. & Order). On appeal, we reversed, holding that material issues of fact existed as to Doe's disability and the legitimacy of the warehouse's safety concerns in declining to hire Doe. *Doe v. Salvation Army*, 531 F.3d 355 (6th Cir. 2008) ("*Doe I*").

On remand, the parties agreed that the district court should rule on the Salvation Army's third argument regarding federal financial assistance before proceeding to trial. No additional briefs were filed. The Salvation Army's initial argument had been that the Rehabilitation Act did not apply because Columbus ARC received no federal funds, even though the Salvation Army admitted that a few entities within the national organization received federal assistance. R. 18 (Def.'s Mot. Summ. J. at 11-12). Doe responded that Congress had rejected a program-specific analysis and that the actions of Columbus ARC were subject to the Rehabilitation Act because other parts of the Salvation Army received federal assistance and the organization was "principally engaged in social services." R. 19 (Pl.'s Resp. at 5). The Salvation Army did not reply at all to this argument. R. 22 (Def.'s Reply). The Salvation Army never argued in the district court that religious organizations were exempt or that it was not principally engaged in the business of providing social services.

The magistrate judge subsequently granted the Salvation Army's motion for summary judgment on the basis that the Salvation Army was a religious organization and therefore not principally engaged in social services. *Doe v. Salvation Army*, No. 2:05-cv-00901, 2010 WL 4939628, at *5-7 (S.D. Ohio Nov. 30, 2010) ("*Doe II*"). In granting summary judgment, the magistrate judge relied heavily on the Salvation Army's answers

to interrogatories and a deposition of one of its leaders.  In the interrogatories, the Salvation Army was asked to "identify the principal activities in which the Salvation Army, Eastern Territory, is engaged," and responded as follows:

> The Salvation Army, a New York Corporation is an international religious charitable organization . . . . [T]he primary purpose of The Salvation Army is to preach the Gospel of Jesus Christ to men and women untouched by ordinary religious efforts, the underprivileged, homeless, alcoholics, drug addicts, and all those rejected by society.  The Salvation Army is, and has been recognized for all purposes to be, a church, a religious denomination. . . .
>
> In addition to over 400 Corps Community Centers (the churches of The Salvation Army), The Salvation Army operates in the Eastern Territory many religious and charitable institutions, including Harbor Light Centers (3), senior citizens centers and clubs (111), community centers and boys and girls clubs (89), camps (13), children's residential care facilities (4), children day care centers (47), adult day care centers (8), group homes for temporary housing (98), as well as Adult Rehabilitation Centers (40).
>
> The Adult Rehabilitation Centers, operated without assistance from the government, Federal, State or local, constitute a principal means whereby The Salvation Army practices its religion in the rehabilitation of spiritually and socially handicapped individuals through a residential program of religious teaching and counseling and work therapy. . . .
>
> The Salvation Army, Eastern Territory, also provides comprehensive social ministries to provide prevention, support, protection, alleviation, rehabilitation, treatment, guidance, education, and opportunities for personal development.  The Salvation Army works to meet physical, social, psychological, emotional, and spiritual needs of families and individuals.  The Salvation Army has designed a range of programs almost as broad as human need and partners with churches, charities, and organizations to reach as many people as is practical.

R. 18, Ex. A (Resps. to Interrogs. at 4-5).  Although Columbus ARC is not a recipient of federal assistance, the Salvation Army admitted that in 2005, its last audited fiscal year, "the Eastern Territory received a total of $148 million of government funds from all sources, only part of which would be federal financial assistance."  R. 18, Ex. A (Resps. to Interrogs. at 3).  Doe timely appeals the dismissal of his claim.

## II.  JURISDICTION

The district court had federal subject-matter jurisdiction under 28 U.S.C. § 1331. The case was heard and decided with the consent of the parties by a magistrate judge under 28 U.S.C. § 636(c).  We have jurisdiction to review the entry of judgment in the district court by a magistrate judge under 28 U.S.C. § 1291 and 28 U.S.C. § 636(c)(3).

## III.  REHABILITATION ACT CLAIM

### A.  Standard of Review

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006).  In doing so, we draw all inferences from the record and construe the evidence in the light most favorable to Doe as the non-moving party. *Id.*  The moving party is entitled to summary judgment when it is clear from the record that there is no genuine issue of material fact and the issue may be resolved as a matter of law.  Fed. R. Civ. P. 56(a).  We also review de novo issues of statutory interpretation. *Hamdi ex rel. Hamdi v. Napolitano*, 620 F.3d 615, 621 (6th Cir. 2010).

### B.  Prima Facie Showing Under Section 504

Section 504 of the Rehabilitation Act of 1973 prohibits "any program or activity receiving Federal financial assistance" from discriminating against an "otherwise qualified individual with a disability . . . solely by reason of her or his disability." 29 U.S.C. § 794(a).[4]  To state a claim for relief under this provision, the plaintiff must show "(1) that he is disabled; (2) that he was otherwise qualified for the position; (3) that he was excluded solely by reason of his disability; (4) and that the relevant program is receiving federal financial assistance." *Doe I*, 531 F.3d at 358.  Only the fourth element is at issue in this appeal.

---

[4]Unless otherwise noted, the opinion will use "§ 504" to refer to the current version of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended by the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28, § 4 (1988).

The term "program or activity" appears in four of the federal discrimination statutes, but was initially not defined by Congress with any more specificity.[5] In 1984, the Supreme Court considered the meaning of the phrase as it related to a claim under § 901(a) of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 373, 20 U.S.C. § 1681(a), and held that the plaintiff must show that the accused program or activity itself received federal financial assistance, not just that the discriminatory program was part of a larger organization that received federal assistance. *Grove City Coll. v. Bell*, 465 U.S. 555, 573-74 (1984); *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 635-36 (1984) (holding same for then-version of § 504 of the Rehabilitation Act).

In response, Congress passed the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988), which amended the Rehabilitation Act of 1973 and the other three statutes to define explicitly "program or activity." Section 504, as amended by the Restoration Act, now defines a program or activity as including "all of the operations of . . . an entire corporation, partnership, or other private organization" if either (1) federal financial "assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole," or (2) the organization "is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation," and any part of the organization receives federal financial assistance. 29 U.S.C. § 794(b), (b)(3)(A)(i)-(ii), *as amended by* Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28, § 4 (1988).[6] The statute

---

[5]*See* Title IX of the Education Amendments of 1972, 20 U.S.C. § 1687; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-4a; Age Discrimination Act of 1975, 42 U.S.C. § 6107.

[6]Section 504 of the Rehabilitation Act, as amended, now reads as follows:

    (a)    Promulgation of rules and regulations

        No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

    (b)    "Program or activity" defined

        For the purposes of this section, the term "program or activity" means all of the operations of—

        (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

        (B) [certain entities] of such State or local government . . . ;

does not define further what it means to be "principally engaged" in one of the delineated businesses, or what any of the specific businesses, e.g., "social services," entails.

The parties agree that the relevant program in this case, Columbus ARC, does not receive any federal financial assistance. The parties also agree that the Salvation Army is a "corporation" and that certain local units of the Salvation Army do receive direct federal financial assistance. *See* Appellee Br. at 11; Appellant Br. at 6-8; R. 18, Ex. A (Resps. to Interrogs. at 4-5). The only issue on appeal is whether the Salvation Army as a corporation is "principally engaged in the business of providing . . . social services" such that another program's receipt of federal funds satisfies Doe's burden of showing that the Salvation Army is within the reach of § 504.[7]

The district court nominally looked to the legislative history of the Civil Rights Restoration Act of 1987 for guidance, but relied heavily on the following sentence in the Senate Report from the Committee on Labor and Human Resources discussing the proposed amendments: "Because they are principally religious organizations,

---

(2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or

(B) a local educational agency (as defined in section 7801 of Title 20), system of vocational education, or other school system;

(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship—

    (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

    (ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance.

29 U.S.C. § 794.

[7]Doe does not appeal the district court's ruling that the Salvation Army's receipt of federal funds was not as an organization "as a whole" under § 794(b)(3)(A)(i).

institutions such as churches, dioceses and synagogues would not be considered to be 'principally engaged in the business of providing education, health care, housing, social services or parks or recreation,' even though they may conduct a number of programs in these areas." S. REP. NO. 100-64, at 18 (1987), *reprinted in* 1988 U.S.C.C.A.N. 3, 19-20. Although the district court found the issue to be "extremely close . . . because of the mixed religious and social nature of the activities that the organization sponsors," it concluded that the Salvation Army was "not principally engaged in the business of social services" because instead it was "a principally religious organization." *Doe II*, 2010 WL 4939628, at *6-7.

Doe concedes that "the Salvation Army is a religious organization," Appellant Br. at 21, but he argues that there is no per se exception for religious organizations in § 504 and that the district court erred in relying on "one sentence" in a Senate Committee Report to create one from whole cloth, *id.* at 18. He also argues that there remains a genuine issue of material fact whether the Salvation Army principally engages in social services. *Id.* at 15-18.[8] The Salvation Army argues that the district court appropriately looked to the legislative history behind the amendments, namely the Senate Committee Report, which the Salvation Army contends supports a categorical exclusion for religious organizations, even if the organization is a corporation providing numerous services to the public. Appellee Br. at 8-9.

The issue on appeal can therefore be broken down into two questions:  (1) does the Rehabilitation Act exclude "religious organizations" from the reach of § 504 even if they are principally engaged in the provision of one of the designated businesses, and, if not, (2) does the Salvation Army "principally engage" in the business of providing social services?

---

[8]Doe mentions in his opening brief on appeal a concern that the Salvation Army never raised the religious-organization argument below, *id.* at 6, 9, but does not raise the argument of waiver until his Reply, *see* Reply Br. at 2-3 (citing cases).

### 1. Application of the Rehabilitation Act to Religious Organizations

We employ a three-step framework to interpret the scope of a statute: "'first, a natural reading of the full text; second, the common-law meaning of the statutory terms; and finally, consideration of the statutory and legislative history for guidance.'" *Hamdi*, 620 F.3d at 621 (quoting *Lockhart v. Napolitano*, 573 F.3d 251, 255 (6th Cir. 2009)). We have not previously addressed whether religious organizations are excluded from the current (or former) version of § 504. Nor have we explored the definition of "principally engaged" or "social services" in any of the four statutes that now contain such language, and neither has any of our sister circuits to our knowledge.[9] The interpretation of these phrases is a matter of first impression.

We start first with the text. A natural reading of the statute does not explicitly exclude or include religious organizations. Although the lack of an explicit exception is not dispositive, the plain meaning of the relevant terms does not weigh in favor of creating an implicit exception for religious organizations. The words "program or activity" are expressly defined, and the delineated list includes entities that easily could be religious organizations, i.e., "an entire corporation, partnership, or other private organization." 29 U.S.C. § 794(b)(3)(A). Many religious groups choose to incorporate under state law, as the Salvation Army has done, R. 18, Ex. A (Resps. to Interrogs. at 1, 4-5); *see also* Paul G. Kauper and Stephen C. Ellis, *Religious Corporations and the Law*, 71 Mich. L. Rev. 1499, 1527 (1973), and the inclusion of the phrase "or other private organization" at the end of the series implies a broad, rather than narrow, initial class of covered entities.

The statute qualifies the inclusion of private entities not receiving funds as a whole, however, by requiring that the entity be "principally engaged in the business of

---

[9]There are a few district-court opinions, but none directly on point. *See Dean v. Corr. Corp. of Am.*, 540 F. Supp. 2d 691, 694 (N.D. Miss. 2008) (discussing relevance of omission of similar clause from unrelated act); *O'Connor v. Metro Ride, Inc.*, 87 F. Supp. 2d 894, 898 & n.1 (D. Minn. 2000) (noting public transit may not be a "social service"); *see also Spann ex. rel. Hopkins v. Word of Faith Christian Ctr. Church*, 589 F. Supp. 2d 759, 762-65 (S.D. Miss. 2008) (discussing whether religious organization "received" funds under Rehabilitation Act, but religious-organization exemption argument raised only with respect to ADA claim).

providing" certain types of public commodities: "education, health care, housing, social services, or parks and recreation." 29 U.S.C. § 794(b)(3)(A)(ii). These services do not appear implicitly to exclude religious organizations; indeed, religious groups have a long tradition of providing education, health care, and social services in this country. *See* Martha Minow, *Public and Private Partnerships: Accounting for the New Religion*, 116 HARV. L. REV. 1229, 1234-35 (2003). And the word "business" includes "transactions or matters of a noncommercial nature." BLACK'S LAW DICTIONARY (9th ed. 2009).

The relevant category in this case, "social services," is a term not defined in Black's Law Dictionary, but Merriam Webster defines "social service" as "an activity designed to promote social well-being; [specifically]: organized philanthropic assistance of the sick, destitute, or unfortunate." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1115 (10th ed. 1995). Random House defines "social service" as "organized welfare efforts carried on under professional auspices by trained personnel." RANDOM HOUSE UNABRIDGED DICTIONARY 1811 (2d ed. 1993). The Salvation Army admits that it "reaches out to men and women in need, providing service ministries to help others," Appellee Br. at 2, which would seem to qualify under either definition, but the Salvation Army argues that these programs cannot be called social service because the Salvation Army undertakes them as a form of religious worship and spreading its gospel, *id.* at 17. The question before us, however, is not the definition of religious worship. What we must decide is whether these activities are "social services," and an organization's motivation for engaging in social services, be it spiritual or altruistic, does not appear to be part of that calculus from the plain meaning of the statutory words. Put simply, the provision of social services may be a form of religious worship, but that makes it no less the provision of social services.

That leaves only the question of whether the Salvation Army is "principally engaged" in these services. The phrase "principally engaged" has been interpreted in other statutory contexts as referring to the primary activities of a business, excluding

only incidental activities.[10]  *See Carrington v. Lawson's Milk Co.*, No. 86-3264, 1987 WL 36691, at *3 (6th Cir. Mar. 6, 1987) (unpublished opinion) (convenience store not "'principally engaged in selling food'" for onsite consumption because service was "'incidental to some other business'") (quoting *Newman v. Piggie Park Enters., Inc.*, 377 F.2d 433, 435-36 (4th Cir. 1967) (holding term "principally" does not require a specific percentage)); *but see Fazzio Real Estate Co. v. Adams*, 396 F.2d 146, 149-50 (5th Cir. 1968) (holding refreshment counter in bowling alley was "principally engaged" in food service for on-site consumption even though half of its sales were from beer, because in such context beer counted as food).  Putting the plain meaning of the full statutory provision all together, a corporation of any kind, religious or otherwise, can be principally engaged in the business of providing social services if the organization primarily takes part in matters that promote social well-being.  We see nothing in the statute's plain text that suggests that an organization's religious status or motivation has any bearing on this inquiry.

Legislative history and context also support including religious organizations receiving federal funds under the reach of the statute.  There is virtually nothing in the legislative history that suggests that Congress intended to exclude *all* religious organizations from § 504.  The Salvation Army on appeal points only to the one sentence in the Senate Committee Report suggesting churches, dioceses, and synagogues would be excluded.  Even if the Senate Committee Report's statement were binding, the language says these entities would remain "principally religious organizations . . . even though they may conduct a number of programs in [the enumerated] areas." S. REP. NO. 100-64, at 18 (1987), *reprinted in* 1988 U.S.C.C.A.N. 3, 19-20.  This sentence says nothing about a religious organization whose participation in such programs is its primary activity, or that churches may never be subject to liability under 29 U.S.C. § 794(a) if the vast majority of their activities are the provision of social services.  Under the Salvation Army's interpretation, numerous nonsecular hospitals receiving federal

---

[10]Black's Law Dictionary defines the adjective "principal" as meaning "[c]hief; primary; most important," suggesting as an adverb it would mean chiefly or primarily.  BLACK'S LAW DICTIONARY (9th ed. 2009).  It defines "engage" as "[t]o employ or involve oneself; to take part in; to embark on." *Id.*

funds could be excluded from the reach of 29 U.S.C. § 794(a) if they are able to establish that they were motivated to provide health services as a form of religious calling or worship.  This would much more certainly embroil the courts in deciding the legitimacy of a religion's chosen form of worship than the question we are tasked with answering today.

Additionally, this one sentence in the Senate Committee Report is not the only legislative history available.  Other language in the same report suggests the exact opposite—Congress intended the Rehabilitation Act of 1973 to apply to religious organizations.  Congress passed the Civil Rights Restoration Act of 1987 to restore the previously broad scope of coverage of the four statutes that used the word "program or activity," including § 504 of the Rehabilitation Act of 1973.  *See* Pub. L. No. 100-259, § 2 (finding "legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered"); *see also Consol. Rail Corp.*, 465 U.S. at 632-34 (declining to impose additional requirement on claims brought under then-applicable version of § 504 in light of clear Congressional intent to reach "all programs receiving federal financial assistance," not just those whose primary purpose was to promote employment).  In the very same Senate Committee Report, we learn that the committee "defeated an amendment . . . that would limit coverage of programs or activities operated by religious organizations to the particular subunit of the organization which receives the federal funds," because except for the religious-tenet exemption, *see infra*, which is not at issue here, "religious recipients of federal financial assistance have been and are subject to the prohibitions on discrimination of the four civil rights laws in the same manner as non-religious recipients of federal aid."  S. REP. NO. 100-64, at 27.

At the time of the Restoration Act's passage, President Reagan expressly vetoed the Restoration Act as drafted due to his concerns that as written, it allowed "sweeping" claims against private entities, including religious organizations.  MESSAGE FROM THE PRESIDENT, PROPOSED LEGISLATION—CIVIL RIGHTS PROTECTION ACT OF 1988, H.R. Doc. No. 100-175, at 8 (2d Sess. 1988).  The President submitted a draft of a bill that

was similar in structure to the one approved by Congress but deleted the clause referring to entities principally engaged in the provision of certain services. *Id.* at 4-5. Even the President's proposed bill, however, did not seek the broad religious exception urged by the Salvation Army. The President's proposed bill included the same express (but limited) religious exception adopted by Congress in the amendments to Title IX, *id.* at 4, but made no mention of an explicit religious exception, limited or otherwise, to the Rehabilitation Act of 1973. Regardless, the House and Senate overrode his veto and made no changes, suggesting yet another rejection of the Salvation Army's position.

The omission of an express exception for religious organizations in § 504 is even more telling given the inclusion of narrow but express exceptions relating explicitly to religious organizations in the amendments to Title IX in the Restoration Act. 20 U.S.C. § 1687, Pub. L. No. 100-259, § 3(a) (1988) ("[S]uch term does not include any operation of an entity which is controlled by a religious organization if the application . . . would not be consistent with the religious tenets of such organization."). Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12113(d), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a), also have express exemptions for religious organizations seeking to require employees to follow certain religious tenets.[11] But neither the ADA nor Title VII immunizes religious organizations from liability entirely for other forms of discrimination against its non-ministerial employees. "[A] religious organization may not discriminate against an individual who satisfies the permitted religious criteria because that individual is disabled." *E.E.O.C. v. Hosanna-Tabor Evangelical Lutheran Church & Sch.*, 597 F.3d 769, 777 (6th Cir. 2010) (citing

---

[11]Title III of the ADA, which prohibits discrimination on the basis of disability in places of public accommodation, also expressly excludes "religious organizations or entities controlled by religious organizations, including places of worship." 42 U.S.C. § 12187. To qualify for these types of exemptions, the institution must first show that it is "religious." The Salvation Army spends much of its brief on appeal on the undisputed proposition that it is "religious" within the meaning of these cases. *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624-25 (6th Cir. 2000); *Schleicher v. Salvation Army*, 518 F.3d 472, 476 (7th Cir. 2008) (Posner, J.) (viewing religious nature of institution's activities through the perspective of the institution). Answering that question often involves categorizing an institution's activities as religious or secular. But whether an institution is "religious" under an express exemption based on "religion" is not relevant to a statute that makes no exemption for or reference to religion at all.

29 C.F.R. § 1630.16), *rev'd on other grounds*, 565 U.S. —, 132 S. Ct. 694 (2012).**12** The inclusion of express and narrow exemptions in these statutes does not support the Salvation Army's interpretation of the Rehabilitation Act as providing a broad implied exception for religious organizations. Congress knew how to draft such an exception and did not. *See Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994) ("Congress has made clear [in the Restoration Act] its intent to extend the scope of Title IX's equal opportunity obligations to the furthest reaches of an institution's programs. We will not defeat that purpose by recognizing artificial distinctions in the structure or operation of an institution.").

### 2. Salvation Army as Principally Engaged in Social Services

The Salvation Army's better argument is not that *all* religious organizations are excluded from the Act; rather, it is that the Salvation Army, like many churches, is not principally engaged in providing social services because such services are only incidental to its other activities. Although the district court erred to the extent that it suggested the Salvation Army was exempt "because of its religious nature," *Doe II*, 2010 WL 4939628, at *7, the court correctly examined "the evidence of record regarding [the Salvation Army's] principal activities," *id.*, in conducting this analysis.

The district court discussed the nature of the various programs offered by the Salvation Army, noting the "mixed religious and social nature of the activities that the organization sponsors." *Id.* at *6. Although emphasizing the Salvation Army's position that its community centers are churches, the district court also noted that the "Salvation Army provides numerous activities and operations that are also social in nature." *Id.* The district court, however, deemed it inappropriate to distinguish the Salvation Army from other churches "simply because it uses different methods to spread its message." *Id.* at *7. The problem with the district court's position is that it implies that social services cease to be social services when done as a form of worship or religious exercise,

---

**12**The Salvation Army has not argued that the employment of someone on psychotropic medications would violate its religious tenets, nor has it argued that the position of warehouse truck driver Doe sought was "ministerial."

thereby transforming them into a categorically different activity. Even starting from the proposition that the Salvation Army is a church and conducts these social programs as a form of worship, there remains a genuine issue of material fact regarding whether the Salvation Army's principal activities are the provision of "social services" within the plain meaning of those terms.

As discussed above, nothing in the statute distinguishes between social services done for worship or spiritual reasons and social services done for secular reasons. If the statute had expressly excluded "religious organizations" or entities engaging in "religious services," we would be faced with the difficult task of deciding whether § 504 applies to a religious organization that defined its religious service as the practice of social service. Under the current language of the statute, however, the Salvation Army is no different from any other church or religious organization that chooses to engage in one of the statutorily designated activities. There is nothing in the plain meaning of the statutory words or the legislative history of § 504 that would exclude social services when done as a form of worship, even though such social services may in some cases also be called religious service.

Given the Salvation Army's description of the many activities it performs, viewed in the light most favorable to Doe, the record suggests that the Salvation Army may be primarily engaged in the provision of social services. The Salvation Army runs day cares, nursing homes, rehabilitation centers, and homeless shelters that offer numerous services to the public. This list is consistent with establishments that would be treated as "social service center[s]" under the Americans with Disabilities Act.[13] At his deposition, Major Reynolds stated that the Salvation Army was "a religious charitable organization; so our motivation is to God, but our service is to mankind." R. 19, Ex. 2 (Dep. Tr. at 19:12-14). The Salvation Army "provides comprehensive social ministries to provide prevention, support, protection, alleviation, rehabilitation,

---

[13]The Americans with Disabilities Act does not define "social service," but its usage in the following list of what would count as a public accommodation facility suggests comparable activities that constitute social service: "(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment." 42 U.S.C. § 12181(7)(K).

treatment, guidance, education, and opportunities for personal development." R. 18, Ex. A (Resps. to Interrogs. at 5). Many of these activities fall within the definition of social services. But, the Salvation Army also appears to engage in activities unrelated to providing for the welfare of the disadvantaged. Again, the fact that the Salvation Army views its social service as a way of spreading its spiritual teachings is not dispositive—an activity can be both. The issue in this case is not whether the Salvation Army is religious or views these services as worship—we do not doubt that it does. The sole issue is whether these activities could be considered "social services," and whether the Salvation Army's primary business is to engage in social services.

Viewing the evidence in the light most favorable to Doe, we conclude that there exists a genuine issue of material fact regarding whether the Salvation Army principally engages in the business of providing social services. Summary judgment was therefore inappropriate.

## IV.  CONCLUSION

For the aforementioned reasons, we **REVERSE** the district court's decision and **REMAND** for further proceedings.